All right, I will tell you that we have read the briefs thoroughly. Mr. Finkel, you've raised a large variety of issues. And so we're familiar with your arguments. I would suggest, given the fact that we have another case up this morning, that you confine your arguments to what we believe are your most significant issues. So with that in mind, how much time would you like? I'd like 20 and 10, if possible, Your Honor. We have another argument set for 1030. I don't, you know, I don't want to circumscribe your argument, but we all have read the briefs. I understand. And I'm going to be focusing on limited issues in my argument, and I will try to get through as quickly as I can. You know, when you prepare for these things, prepare with a certain amount of time. And for me to start at this point trying to figure out what I'm not going to say. OK, so with that understanding, Mr. Finkel, we're going to hold you significantly. I usually don't cut people off. If you want 20 and 10, 20 and 10 it is. OK, Ms. Jackner. Your Honor, I'd like to reserve my entire time dependent on the arguments that are raised by opposing counsel. Well, tell us how much time you'd like. I will take 15 minutes. Thank you. And as I'm sure you both know, the microphone in front of you is not for amplification. It's strictly for recording the argument. So if you would keep your voices up so we and everybody else in the courtroom can hear you, we'd appreciate that. And with that, Mr. Finkel, would you like to proceed? Yes. Thank you very much. May it please the Court, again, Leon Finkel with Berger-Shatz on behalf of the Appellant, Karen Newsom. Your Honors know that abuse of discretion is a difficult standard to overcome on appeal. The trial court abuses its discretion when no reasonable person would take the view adopted by the court. While difficult, the standard is there for a reason. Because there are times that judges abuse their discretion. Newsom is such a case. The trial court's decision in Newsom is the most egregious decision rendered in any case I have been involved in, in my 35 years of practice. As we will show, the court abuses discretion, didn't follow the statute, and misinterpreted the party's agreement. I'm going to focus my remarks primarily on the modification of unallocated maintenance and child support. Because that was the most egregious aspect of the decision as it relates to my client. As your Honors know, the judgment was entered on July 8th, 2010 after a 17-year marriage that produced two children. And that Karen was unemployed at the time of the judgment. It's critical for the court to consider the bargain that the parties reached when they entered into their marital settlement agreement. It was for a 72-month income-sharing arrangement that was non-modifiable as to the duration of the term. She bargained to share their income equally during that six-year period. And while the agreement is clearly modifiable as to amount, it is only modifiable based upon a substantial change of circumstances that was not foreseen and contemplated by the parties. So they did a true-up in 2012, right? Yes. And at that time, your client knew about the stock options that her husband had been awarded, right? She did not know the amounts that he had recovered. She knew about the stock options. That's probably true. And she didn't suggest then or in any subsequent year that those stock options should be included in the definition of income under the MSA. Your Honor, if I may, the court's decision that she was entitled to that money was not challenged. So I'm not sure what the relevance or what point the court's trying to bring out. But she certainly did not know the amount that she was entitled to and certainly was not agreeing to give up any of her rights under the agreement. Well, how are you supposed to figure out how much money the client is entitled to? Didn't the agreement call for a true-up, as my colleague has suggested? It's actually quite simple. First of all, the court determined what the amount was, $370,000. Secondly, the maintenance that was being paid to her, the scheme in their marital settlement agreement, in Paragraph 2A of the marital settlement agreement, talks about what income is subject to the true-up. It specifically excludes bonuses. Bonuses, and then the true-up, Paragraph 2G, specifically excludes bonuses. And then there's either 2B or 2C of the agreement that specifically says that bonuses are to be paid within seven days. And these performance shares were bonuses. They were labeled as bonuses and they should have been treated as bonuses. So Karen's position is that she was entitled to the full complement of what she was entitled to under the agreement for the six-year period unless there was a substantial change in circumstances that would have warranted a reduction in the amount of support, and that's really the focus of my argument. And again, and I'm not sure if I said this or not, but for this agreement, she would have been entitled to indefinite maintenance. No one was going to give her time-limited maintenance on a 17-year marriage. She bargained to get half of the available income for those six years. And there's a factor under 510A5. It's 510A5, which deals with the modification of maintenance. It specifically addresses the situation that I'm talking about. We didn't handle it at home in our brief, but I want to handle it at home now. And 510A55 provides that the court must consider the duration of the maintenance payments previously paid and remaining to be paid relative to the length of the marriage. Had the court given proper consideration to the parties' bargain, it would have been much more circumspect about modifying it because it was time-limited and because she would only get it for another few years. The court found four bases to support its finding that there was a substantial change in circumstances. The court said, first and foremost, the parties' oldest son's emancipation. Secondly, that the fact that the second child was no longer attending private school. Third, that Karen was employed. And fourth, Karen's bad faith in not paying for less than $20,000 of certain expenses for the children at a time that Alan was withholding $370,000 of support. Now let's start with the oldest child having emancipated. That was not only foreseen, that was definite. There was no question that the child was going to emancipate during the period of time that the unallocated maintenance and child support was to be paid. Had the parties wanted to provide for modification based upon an emancipation, which would not have been in keeping from a tax perspective of unallocated maintenance and child support, it would have said so in the agreement. But they didn't say so. We cited for the court in reign of marriage of Verde and in reign of marriage of Rainer to address the fact that if it's foreseeable, it's not a substantial change of circumstances. I would also bring to the court's attention in reign of marriage of Burnet, 17LF, 2nd, 160583, which cites Verde. And in that case, the trial court terminated a permanent maintenance award. The trial court, the panel court reversed, stating that the retirement was foreseeable and therefore not a basis to terminate maintenance. Again, the oldest child's emancipation was an absolute certainty. Although it's obvious that it was foreseen, the marital settlement agreement also supports the intent of the parties. Paragraph 2D of the marital settlement agreement provides for child support to be determined when unallocated maintenance terminates. And the unallocated maintenance terminates after the oldest child's emancipation. So the court's basis, which was first and foremost to quote Judge Lopez, was no basis whatsoever. And it's also interesting to note that Allen, in his petition for modification, does not even seek modification in its wherefore clause. Allen was concerned about the fact that the oldest child was going to college at Stanford and wanted to be sure, since he was sharing half of his income with his ex-wife, that she was paying the proper amount of college expenses. It's so noteworthy, Your Honors, that in the wherefore clause of Allen's petition, it simply requests, enter an order allocating the respective contribution of the parties to the college and related expenses of MD and grant such other and further relief as the court deems just. Allen didn't even ask for modification in the prayer for relief of his petition. The second basis was that Clara was not attending, I'll try not to use tilde save, but that the second child was not attending private school. This had an equal impact on each party. Each party saved $15,000 or $16,000 by virtue of the fact that the child was no longer attending private school. But even if it was a basis for modification, it's unconscionable to reduce Karen's support from more than $300,000 per year to $66,000 per year because she no longer had to pay $16,000 a year in private school expenses. It just makes no sense and no reasonable person could agree with that. The third basis was Karen's employment. Karen's employment was absolutely contemplated. In fact, that was the basis of Allen's petition for modification, the fact that she was unemployed. Now, did she ever disclose to her ex-husband what she earned? Did she ever give him her tax returns? I don't know the answer to that. I think it's a no. Well, I know she gave him at least one year's tax return because the court notes it in its decision, but what the court doesn't know is that Allen didn't give his tax returns either. The court applied a double standard here. You have an MSA that depends on the cooperation between two parents, and it's not forthcoming. Right? Did Karen ever tell Allen that she consented to any of the expenses he incurred on behalf of the children? Did she ever say, sure, go ahead? He says, I've got to take one of the children to the doctor. I've got to buy equipment for their extracurriculars. Did she ever say, sure, I'll share that with you? The record would suggest no, except for the fact that she also paid expenses for the children, but she didn't receive reimbursement. But I think the better question, respectfully, is did she have the right to rely on the agreement, which provides, and I can tell you specifically where it provides it, that the equal payments required by each party for the children's expenses was predicated on an equal sharing of their income. So what we have here is the court allows Allen to rely on his interpretation of the agreement, saying, I don't owe this $370,000. But when Karen relies on an agreement and says, I don't owe you this $20,000, $9,000 of it, which is for a botanistic party, which isn't even appropriate under the agreement to order her to pay, and which she said no to, because there's a difference between a botanist and a botanist herself. The service itself and the act of becoming a botanist and having a party, I mean, there's all kinds of debates amongst married couples, divorced couples, about what they want to do for parties for their kids. That wasn't contemplated by the agreement. That was $9,000. That was the biggest amount that the court said that she didn't pay. It was $9,000 for a party. It was less than $20,000. She loses $300,000 of income because she didn't pay $20,000 of expenses because she believed she was entitled to that income. So as I was saying to the court, Karen's employment cannot be a basis to modify the unallocated man's and child's support. Allen complains in his petition that she was unemployed. Now she's employed, making $96,000 a year. Karen's damned if she doesn't, damned if she doesn't. If she doesn't work, she's criticized for not working. There should be a reduction in maintenance. If she does work, it's a basis for a modification in her maintenance and child support. When the formula the parties reached already took into consideration her income. So if she works and she makes $96,000, that's an extra $48,000 for each of the parties. Yet because she's making $96,000, the court takes away over $200,000 of her income by virtue of the modification that the court did. Was a portion, at least a portion, of the court's rulings based on its assessment of the credibility of Allen and Karen? What difference does it make? I asked you a question. No, I didn't respond. I didn't respond to, obviously, my response. The fact that the court found her to be not credible, there must be a nexus between that finding, and I'm not asking the court to vacate the court's finding about her credibility. That's not appropriate. That was within the court's purview. But what difference does it make? And often that is a rhetorical question. It doesn't go to the issue of why it took away over $300,000 a year of income to her. Credibility is not a reason to lose your maintenance and child support. And the court did find bad faith. And as I mentioned to the court, if the court had construed the agreement properly, it would not have used bad faith as a basis to reduce her support because she had a right to rely on the agreement and to have half of the income. Again, $20,000 versus $370,000. The court also found that Allen had a good faith basis for saying that the restricted stock was not included in the definition of income for purposes of income sharing. You found that, right? Yes. Okay. So given that there was a good faith dispute between the parties about it, I don't understand your position that the trial court deprived her of this income sharing. He ultimately ordered it. He just said it's not going to accrue interest until the date of my ruling because there was a good faith dispute. But he didn't pay it after the ruling, Your Honors. He did not say. No, but what I'm saying is after the court rendered its declaratory judgment decision saying it is includable, Allen knew exactly how much. All you had to do was take the amount of the bonus and divide it by two and pay it to her. But she waited and waited and the money was never forthcoming. And he wasn't criticized for holding back that money, but she was for holding back $20,000 in expenses. Was it determined by the court to be income or bonus? The court didn't say. What difference would it make? That's a great question, if I may say so. If it's a bonus, then it's paid based on the seven days. If it's not a bonus, then it's based on the true amount. But Allen had his own understanding of what. What's your position? It's a bonus. It's a bonus because the performance sharers say it's a bonus. And it doesn't fit. The judge called it a business income. But that's not what was meant by the game. The business income was if he was self-employed, earning a business income. That income's on his employment. Didn't the court actually find that it was income as opposed to bonus? I don't believe so. If I missed that, I apologize. I know he referred to it as business income. I don't think he ever addressed the issue as to whether it was bonus or not. But it wouldn't change my argument in the sense that if he received business, even if he received it as business income, he knew that he owed him a substantial amount of money. And to say because the court continued it to a later date in the event of a dispute just means that if the parties can't agree on the amount, then I'll decide it. It doesn't mean that he should have fought for what he believes is owed under the agreement. And that goes more to the interest question in any event, Your Honors, which I'm resting on my brief as it relates to the question of interest here. But as it relates to the modification, again, this is what I'm trying to hammer home. There is no basis for this. Finding bad faith in not paying $20,000 of expenses cannot be the basis for modifying her support so drastically. And not only does the agreement say so long as they are sharing each other's income equally, Allen acknowledges in his pleading that this is a prerequisite to having to pay for her share of expenses when he says Karen has received all unallocated support payments from Allen in accordance with the settlement agreement. Not true. He knew it wasn't true. He still knew it was not true after the court made its decision on the declaratory judgment. As a matter of law, it was error to characterize Karen's conduct as bad faith in light of the provisions of the marital settlement agreement. If I have time, I will show that Allen's own conduct was worse. And most importantly, in no event does bad faith form a basis upon which to modify the unallocated maintenance. And the court came up with a cure and a solution in any event. He didn't have to in a draconian manner reduce her support. The court allowed Allen going forward to determine what the expenses were and to deduct it from her support. He didn't have to reduce her support by more than 80 percent to cure the problem. If the court agrees that there was a basis to modify, which we suggest there was no basis to modify, then the amount of the reduction was unconscionable. I think it's important for the court to know the trial court's statement. And so I've got in deciding the notion to reconsider. And so if I've got to be very candid for the record, two rich people fighting over who cares, who knows who what, is not as high a federal rate as my risk of harm to children cases. Then the court, in determining the amount of maintenance, specifically considered the division of assets. Well, if you look at Allen's affidavit from before the divorce and Karen's affidavit after the divorce, these were not wealthy people. He made a nice income. They spent it. They had a great lifestyle, which she's now been deprived of because $254,000 was taken away from her. In any event, Allen's affidavit suggests that they had a home, which had maybe $150,000 of equity, and some retirement accounts. At the time of the hearing, Karen had less than $90,000 in cash, some retirement, and $25,000 of debt. The court couldn't have possibly considered if the $370,000 that she was owed in maintenance somehow made her a wealthy person when she ended up with $40,000 of it after the credits and the payment of the attorney's fees. She was not in a good financial position. The measure of activity literally killed her. Money that she used to live on to support herself and the children that was then taken away from her as a credit against the $370,000 that was owed to her. We don't believe the court clearly considered the statutory factors. One more point, if I may. In looking at the amount of maintenance and looking at the amount of child support, guideline child support would have been $7,130 per month. The court was obligated to make a specific finding as to why it deviated from the statute. The only finding that the court made was that it's sufficient to take care of the children's needs. And we all know that needs is not the standard for determining child support. It's what the lifestyle would have been but for the dissolution of the marriage. So there was no basis to go below guidelines even if this was modifiable. And I just want to, in closing, suggest to the court that even if we looked at today's guidelines on maintenance where the income sharing, where the total combined income is $500,000 and in this situation it was more than $500,000 of income, but even if we looked at it as Ellen earning $420,000 and Karen earning $96,000, 30% minus 20% capped at 40% of the combined income, she would be entitled to $8,667 per month. She would be entitled to less because he made more than $420,000, made actually over $600,000 a year. The amount of maintenance that the judge ordered was obscene, absolutely obscene, given the circumstances of their deal, given the basis that he provided for the support. So she's left, assuming she makes $8,000 a month, which she's not, she's left with a gross of $13,500, approximately $10,000 after taxes from which she's required to pay all of her expenses, the children's expenses, including Max's college, her contribution, and now without child support amendments she's obligated to provide for the younger child as well. Last point, the court incorrectly found that Karen had retained windfall sums by virtue of her failure to pay expenses as agreed under the judgment. She was ultimately ordered to repay $14,000 of it. The only thing she wasn't ordered to repay was $2,900 for orthodontia. That's the windfall that we're talking about here? $2,900? Your Honor, for those reasons, we believe that the court should reverse the trial court's decision with regard to maintenance, and I'll save my comments for later. All right. Thank you. Thank you, Mr. Finkel. Ms. Jochner? Again, good morning, Your Honors. Michelle Jochner on behalf of the appellee, Alan Drimmer. Your Honors, what you have heard here was about 20 minutes or so of argument in which Karen Newsom has been cast as a victim of not only Alan, but also of the trial court, which has been impugned as having personal animus against her to the extent that she claims that she was, quote, punished, penalized, and thrown to the wolves, simply because the trial court properly applied the law and properly exercised its jurisdiction under the specific facts of this case, and because Karen was repeatedly found not to be credible by the circuit court, who sits in the best possible position to assess the demeanor of the parties during their testimony and their conduct before the trial court, where Alan was found to be repeatedly credible. Indeed, as we detail in our brief, much of Karen's argument rests upon hyperbolic complaints, which are untethered to any specific legal argument, case law, statutes, nor specific pages of the record, all in violation of Supreme Court Rule 341H7. And accordingly, as we state in our brief, many of her arguments are simply forfeited, Your Honors, and notably in her reply, Karen does not once contest our claims of forfeiture. In fact, most of her reply simply repeats her arguments from her opening brief and does not address Alan's legal or factual arguments, which are left unrefuted. And you saw that here today. Many times Mr. Finkel referred to trial court pleadings rather than the appellate briefs in this case. Well, Mr. Finkel contends that just because Judge Lopez found Karen to be less than Okay, Your Honor, credibility is a very important part of the overall assessment that a trial court makes in assessing and exercising its discretion. The trial court's decisions were very much within a solid exercise of its discretion and there was no error of law, a proper application of law as well. Credibility was only one factor. Your Honors, Judge Lopez entered a 23-page decision on May 3, 2016, which really in much detail sets forth his analysis and reasoning for every part of his decision here. And Your Honors, you have to realize as well that at the time when Judge Lopez rendered this decision, there were five pending matters that were before him. So he had to assess each one of those matters and make a resolution here. And that is why as of May 3, there was much discussion from the other side that as of the grant of partial summary judgment, I'm sorry, grant of partial declaratory judgment in December of 2015, that Judge Lopez at that point had decided that Allen was on the hook for a great amount of money. That is not the case, Your Honors. As of that specific date, when partial declaratory judgment was granted, the trial court simply construed the portion of the marital settlement agreement which defined income. And Justice Latimer, you asked about whether Judge Lopez stated that the arrearage was income. He did. It's at R33 of the record, and it's also in his order that he looked at this as being part of Allen's income. And he did state then specifically during the declaratory judgment proceedings that he was not going to go any further and decide whether there actually was an arrearage. All he was doing at that point was construing the provisions of the MSA. That happened later in the May 3 order. That was the very first time when Judge Lopez determined that Allen had an arrearage. But he also determined that it was based upon Allen's good faith interpretation of the MSA that he believed that the vesting of the restricted stock units did not fall within the definition of income. And he found that Allen's basis for believing that was reasonable under the circumstances. So Allen was never found in contempt of court. He was found to have had a reasonable basis. And Judge Lopez, though, determining that the vesting of the restricted stock units fell within income, at that point then he determined that Allen did owe around $370,000 in back support. At the same time, though, as a function of the fact that the court had to deal with these five different pending matters that were resolved within that same order, Judge Lopez then determined that there were credits against that amount. And some of it was for monies that Karen owed to Allen, and also it was the retroactive modification of support, which left with about $71,000 that Allen owed after all of those credits had gone back and forth. Now, there was some talk here about Karen being unemployed at the time of the judgment. Well, that is true. But that's not the entire story, Your Honors. The record is very clear, and we set this out in our brief, that Karen was employed for the majority of the party's 17-year marriage. And that can be found also in Exhibit 107, which we reference in our brief. And I just want to state something very quickly about the exhibits, which may not be clear. The stipulation for preparation of the supplemental record on appeal has a running number of exhibits in the very beginning column. Those are the exhibit numbers that I refer to. That was before the exhibits were actually uploaded. I just want to make sure that that's clarified and that there is no confusion as to the exhibits. She was employed for the majority of the party's 17-year marriage. And in her reply, Karen misrepresents that she was a stay-at-home mother and a homemaker in a 17-year marriage. And based upon this, she makes the unsupported claim that she would have been entitled to permanent maintenance absent the bargain that she struck. And we heard a little bit about the bargain as well. Well, the record reflects that she was employed for the majority of the marriage. There was no entitlement to permanent maintenance under that factual situation. And even considering her bargain that she said that she struck, the MSA clearly established that the amount of support was modifiable. This was not a surprise. She bargained for it to be modifiable and to terminate 72 months after it first began, which was in July 2016. And also, we know that under the case law, unallocated support is always modifiable. Judge Lopez looked at the situation here and at the facts that were present. And effectively, what the court did here, Your Honors, as we discuss in our brief, is that the court effectively did the true-up that the parties failed to do. So the court effectively conducted the true-up for the several-year period. And it's very evident from the record that Karen refused to engage in annual true-ups as required by the MSA. Judge Mason, you asked whether she was forthright in disclosing her financial circumstances. The record clearly shows that she was not. And even the 2012 true-up was very difficult because Allen's counsel had to basically chase Karen and her counsel in order to be able to get the financial records to do that 2012 true-up, which was done by an accountant, which she retained, and also which was only in the amount of $2,100 despite the fact that she was aware that Allen received these payments. So does the fact that Karen was recalcitrant in complying with the true-up provisions justify Allen in not doing the same? No. To the extent both parties should have engaged in what the marriage settlement agreement required of them to do. But the fact is that neither party did. But Karen was the one who was complaining about the fact that Allen had not included certain amounts. But this was, again, very far after the fact. I also want to note that in her reply that Karen makes a statement that, a very long time, she is also somehow challenging the court's ruling on the motion on the rule to show cause and that Allen was found not to be in contempt and that his belief in that the restricted stock units were income was reasonable. Your Honors, there is nothing in their brief, in their opening brief at all, that challenges the circuit court's ruling that Allen was not in contempt of court, that he had a reasonable belief that the best of the restricted stock units was not income, and that remains unchallenged. And that is a very, very important part. He was operating under a very reasonable belief, according to the circuit court. The modification of the support and the child support was very well supported by the circuit court and very well documented in its order. The circuit court stated very clearly that it had relied upon the Section 504 factors, noting that the parties did have an agreement to terminate maintenance as of July 31, 2016, that Karen was awarded 50% of the substantial marital assets at the time of the dissolution, that her receipt from Allen of more than $1 million in unallocated maintenance and property since the judgment was 50% of his income, and she basically kept 100% of it, less those few things that she did pay for, because she found a way to be obstructionist and not to cooperate with Allen in any way. The circuit court details this very specifically both in its oral discussion and rulings during the hearings and also in its written orders, as well about the million of times that Karen refused to reasonably respond to Allen. And the court also states throughout its rulings that it felt that Karen violated the implied covenant of good faith and fair dealing that exists within every contract, including within the marital settlement agreement. Counsel also here today cited in remarriage of Brene. I object to that because that was not cited in their brief at all. And basically, Your Honors, I think as you've seen from their brief, there are certain sections of their argument that have absolutely no legal citation at all, not one case for various arguments, nothing. And if they do cite a case, it's in passing, it's not related or tied back to the maintain many of their arguments for that basis because they do clearly violate Rule 341H7 that they are forfeited. With respect to child support, briefly, they spoke about reductions in child support. Yes, the circuit court had a downward deviation for child support, but it was based upon two reasons. The guideline level would be a windfall to Karen because it exceeds the minor's reasonable monthly needs, and the court also said in its May 3rd order that it had also reduced by 30% Karen's contribution to the expenses of the minor child, where before she was responsible for 50%. After the entry of the order, she only was responsible for 20%. And the court allowed Alan to deduct this amount from his child support. So there were very valid reasons that the court stated for the downward deviation in support. And again, one of your honors, maybe perhaps it was Justice Mason who said that the MSA required co-parenting and cooperation. Again, as I stated, and which is stated in our brief in much detail, the court found bad faith on the part of Karen with respect to that cooperation that was One of those was with respect to the bat mitzvah expenses, which we talk about in detail in our brief. The MSA is Section 3A, 3B, and also the custody and joint parenting judgment in Section F2. All of those provisions need to be read together as a whole to show that the bat mitzvah expenses were definitely contemplated to be shared by the parties. And especially the language, as I explained in the brief, including but not limited to. That language is in 3A, and case law clearly says that that language means that it includes other items that are not specifically listed. And reading it together, the bat mitzvah expenses were all covered in there. I think that perhaps I am getting close to my time, but I would just like to say with respect to the motion to reopen proofs, counsel talked a little bit about here. I just want to note for the record that they have no reply at all. There is not one section in their reply brief that talks about the motion to reopen proofs. And as a final point, Your Honor, I just would like to clarify that in her briefs to this court, Karen and her counsel make two outlandish claims against Allen. The first is, for lack of a better word, that Allen was somehow a deadbeat father because he missed child support payments. And, Your Honor, I want to make it very clear to you that Allen never missed any child support payments. It is a misrepresentation of the record, and it's very important for Allen to make that very clear that he never, ever missed any child support payments. It places him in a false light and without any basis whatsoever. And Karen also, in her brief, speaks repeatedly about alleged perjury, throws that word around like it has no meaning whatsoever. It has a lot of meaning to the person that it's aimed against. There is no evidence whatsoever in this record, and we state that very clearly in the brief. And notably, there is no reply made in Karen's reply to refute the statements against this, and I think really that does say it all. The silence says everything. So, Your Honors, again, just to underscore, we believe much of Karen's argument was forfeited. What was not forfeited lacks merit. Allen was found to be very credible, and we would ask that you affirm the Circuit Court's judgment in its entirety. Thank you. Thank you. Mr. Finkel? Thank you. Counsel noted silence as being somehow a basis to suggest that our original brief didn't provide what we wanted it to say on these issues. But I would ask the Court to note counsel's silence in responding to my arguments today about whether there was a basis to modify the support given the foreseeable circumstances and the amount of the reduction. That silence is deafening, Your Honors. Counsel talks about the fact that the Court somehow did something for Karen by reducing her obligations to pay for the children's direct expenses by 30 percent, from 50 percent to 20 percent. But at this point, the kids weren't attending private school. You're talking about a few thousand dollars a year in medical expenses. And they would also suggest that because she had this income available to her that she wasn't spending on the kids just because she didn't spend it on these medical expenses that she withheld because she believed she had the right to do so under the agreement, just like Mr. Drimmer felt that he had the right under the agreement. The problem is, Mr. Finkel, with your argument, is had she been cooperating as the MSA contemplated, she would have said yes or no. And Alan could then bring that to the Court. Instead, she said nothing. Okay. So what are we going to do about it, Judge? What are we going to do? Are we going to cut her support because of it? Is that what we're going to do? We're going to cut her child support and her maintenance because she was uncooperative and didn't pay expenses when there was a better solution, which the Court adopted itself and said, you're going to make the decisions going forward. You're going to get the right to deduct it from her support. It was draconian. It was a penalty. Over $300,000 a year in income down to $66,000 because she paid less than $20,000 in expenses that she was ultimately ordered to pay three-quarters of. If that's not unconscionable, I don't know what the word unconscionable means. And again, as it relates to this issue of credibility and bad faith, so you found her to have been incredible, or Judge Lopez found her to. So his finding of bad faith is, you don't accept my arguments. What is the nexus between bad faith and lack of credibility as it relates to the amount of support she's entitled to? Yes, there was a 23-page decision. Most of it was quoting the statute or quoting the agreement, but it doesn't answer the questions that I've raised for the Court today. She had a reasonable belief herself that she could rely on the fact that she was entitled to half the income, just like the Court found he had a reasonable belief. Now back to Judge Lavin's question about whether this was bonus or income. The fact that the Court found it to be income doesn't mean he was excluding it as bonus. I still maintain that the Court did not make a specific finding as it relates to whether it was bonus or income. Ultimately, it doesn't make a lot of difference because it really impacts the question of interest and attorney's fees. It doesn't impact the question of modifiability. There's no question that notwithstanding that Cam was making about $80,000 a year before the judgment was entered, before she was unemployed at the time, but previously, that she would have been entitled to indefinite maintenance. I didn't say permanent, or maybe the brief said permanent, but today I'm saying indefinite. No judge would have done anything other than reviewable maintenance with this case. She gave up her right to income share for those six years. He was making $600,000, she was making $80,000. Of course she was entitled to maintenance. The fact that they didn't have much of an estate, and as counsel points out, the Court found that the substantial marital assets, these weren't substantial marital assets that allowed her to support herself or her children. This was not a substantial asset case. These were not rich people. So these windfall sums that counsel talks about are the sums that she used to pay her rent, to pay for food, to pay for entertainment for the children, to pay her own expenses. Yes, hers too. She was entitled to it. It was maintenance. She was entitled to live that lifestyle. She was even entitled to save money during the six-year period, if she could afford to do it, because she bargained for six years. Finally, I just want to speak to the fact that I believe there was a double standard applied here. The trial court ignored the fact that Karen did not receive her share of the proceeds from the sale of the home until November of 2013. It was due on December 31, 2010. Alan never notified. He was under an obligation to notify her every time his income increased. Never notified her. And he never increased the monthly amount. She got the same monthly amount. The date of the judgment is what she was getting until the judge modified it. Never increased it. Alan's disclosure statement doesn't include his performance incentive bonus income. Is that good faith? That's sanctionable under our new laws, our new rules as it relates to disclosure statements. Another one that just really strikes me is he had an exhibit. It's Respondents Exhibit 1. He claims $24,823 is due to him, all for day-to-day living expenses. Please look at Respondents Exhibit 1. I won't take the time to go through it. Day-to-day living expenses. The same expenses she has for the child. Somehow they were supposed to quantify their day-to-day living expenses, and he was entitled to half of it. The judge doesn't give it to him but doesn't criticize him for asking. She's the only one who gets criticized. The court found that it cannot hold Karen in contempt of the court finding good cause for her noncompliance regarding the orthodontia. We talked about the tax returns. My final thing is this issue whether there was perjury or not perjury here. There's one thing that's not debatable. He proffered on the court this theory that he was entitled to reduce his income by $87,347 for unreimbursed business expenses. The court rejected that because his tax return said something else. So whether this is perjury or not. It's a pretty serious allegation to throw around. If I could take it back, I would. I mean, I can't be any more candid than that. It's a pretty serious allegation. Judge, I didn't try the case, and if I could take it back, I would. But I can tell the court the fact that he tried to get the court to reduce his income by $87,000, while perhaps not perjurous, was wrong. It was inappropriate. The court clearly committed a double standard here. I'm going to ask you to wrap up. So to wrap it up, it's our position, Your Honors, that the record belies the court's findings, that no reasonable person can conclude that the court's modification of the unallocated maintenance and child support, let alone the Dranconian modification reducing the maintenance by 80%, retroactive to July 1, 2014, is considerable, let alone reasonable. The court should have avoided interest in attorney's fees and should not have avoided caring to pay any of Allen's attorney's fees. We respectfully request that the trial court decision be reversed and that Allen's petition for modification be denied. Thank you very much, Your Honors. Thank you. Thank you both for your arguments here this morning and your briefs. We will take the matter under advisement.